Kenneth DAVIS, a/k/a Kenneth T. Davis, and Faye Davis, a/k/a B. Faye Davis, husband and wife, Appellees,

v.

Delbert DAVIS and Maureen Davis, his wife; Johnnie Davis and Rosella Davis, his wife; Cecil Davis and Agnes Davis, his wife; Johnny D'Arcangelis and Louise D'Arcangelis, his wife; Leroy Davis and Josephine Davis, his wife; Walter C. Davis and Wanda Lou Davis, his wife; Kate L. Davis Skulley; and the unknown heirs, executors, trustees, successors, and assigns of W. J. Davis, deceased, W. E. Davis, deceased, A. T. Davis, deceased, J. E. Davis, deceased, Elizabeth Davis, deceased, and John W. Davis, deceased, respectively, Appellants.

No. 54816.

Court of Appeals of Oklahoma, Division No. 2.

May 19, 1981.

As Corrected May 29, 1981.

Rehearing Denied June 10, 1981.

Certiorari Denied July 28, 1981.

Released for Publication by Order of Court of Appeals July 30, 1981.

Jerry W. Rizley, Woodward, for appellees.

G. W. Armor, Armor & Gottsch, Laverne, for appellants.

BRIGHTMIRE, Judge.

The primary issue raised by the defeated defendants is whether they possess any mineral interest in certain Ellis County, Oklahoma land as a result of a "family agreement" executed by the heirs of John W. Davis in 1934—six months before the county court distributed the land to two of the heirs in a decree that recited it was doing so in accordance with the agreement. We hold appellants do not possess any of the mineral interests and affirm the trial court's judgment.

I

The history of this familial conflict begins with the death of the patriarch, John W. Davis, in 1934. Seventeen years before, he had acquired certificates of purchase covering a half section of Ellis County land. Surviving him were four sons and one

daughter, W. E. Davis, W. J. Davis, A. T. Davis, J. E. Davis and Kate Davis Skulley, respectively. On June 1, 1934, these heirs entered into a family agreement dividing their father's estate. The only details relevant to this case are that Kate Davis Skulley was to get the north half of the half section and her four brothers were to get cash equivalents either by cancellation of notes owing their father or from the proceeds realized from the sale of the south half of the half section. The agreement also contained this paragraph: "It is agreed that each of the five heirs is to receive one-fifth interest of Oil Roalty [sic] on the West Half of Section 16, Twp. 20 N. Range 24 W.I.M. Ellis County, Oklahoma should oil be produced on said land."

This pact was filed in the pending probate case.

A decree of distribution was entered January 22, 1935, finding that the heirs by written agreement executed June 1, 1934, "agreed and stipulated . . . as follows: That the Northwest [Q]uarter . . . should be set apart to the said Kate L. Davis Skulley, and that the Southwest [Q]uarter . . . be set apart to the said W. E. Davis, and said agreement . . . is hereby in all things and particulars approved and confirmed by the Court and said lands are hereby so set apart to each of the said Kate L. Davis Skulley and W. E. Davis." [1] The decree continued, "It is therefore . . . decreed . . . that the above shares . . . be and the same are hereby . . . vested . . . and conveyed to said heirs."

The next salient event took place at Perryton, Texas, on February 2, 1937. There, at that time Kate Skulley and her husband executed an agreement with Kenneth Davis, son of W. E. Davis. In it the Skulleys said that "for a valuable consideration [we have] transferred or assigned [our] *interest*

---

1. W. E. Davis, the administrator of the estate, evidently bought his brothers', interest in the southwest quarter. There is no indication that anyone ever complained of this decretal variance from the written agreement. If he did buy his brothers' land, it is entirely possible that he also bought their mineral interests. And if he did, he ended up with half of the mineral interest and Kate Skulley with the other half after the decree of distribution was signed. This may be one reason Kate Skulley does not denounce the decree as void.

to [Kenneth Davis] in and to the"[2] north-west quarter Kate Skulley inherited. The agreement, drawn by the Skulleys' lawyer in Texas, also recited that as part of the consideration the Skulleys "reserve unto themselves ..." a stock tank, some loose lumber and a cook stove. It was also stipulated that the Skulleys had rented the land for fall wheat planting in 1936–37 and that Kenneth Davis was to get their one-third of the wheat harvested in the summer of 1937. "This agreement," the instrument said, "is made in order that there might be no misunderstanding about the situation."

In 1942 W. E. Davis obtained a patent from the State of Oklahoma to the southwest quarter and conveyed the tract to his son, Kenneth Davis, in 1948. In the meantime, in 1947, Kenneth Davis finished paying for the northwest quarter and received a patent title to the land from the State of Oklahoma.

The first oil and gas leases on subject land shown in this record were executed in 1946 by W. E. Davis for a term of 10 years covering the southwest quarter and by Kenneth Davis for a term of 10 years covering the northwest quarter. In 1955 Kenneth Davis executed another 10 year oil and gas lease on the northwest quarter and W. E. Davis joined Kenneth in executing a similar one on the southwest quarter. In 1967 Kenneth Davis gave a five year lease on the entire west half, another one in 1972, and a three year oil and gas lease on the 320 acres in 1977, which lease was still in force at the time of trial. Sometime later an abstract of the property was examined for an oil company. The examiner ran across the 1934 agreement. Kenneth Davis and his wife filed this action on July 25, 1979, to quiet their title to all the mineral rights in subject land against the only surviving signer of the 1934 contract, Kate Skulley, and a number of other people who are descendants of Kate Skulley's four deceased brothers.

At the close of the evidence on January 23, 1980, the trial court resolved all issues of law and fact in favor of Kenneth Davis and his wife and quieted their title to the entire west half as against the claims of Kate Skulley and all of the other defendants named in the lawsuit. No mention was made of defendants' cross-petitions, but since the court, to be consistent, would have had to have denied defendants the relief they requested, we shall consider them as having been adjudicated in favor of the plaintiffs by implication.

Defendants, for reversal, set up five errors they say the court committed, namely: (1) refusing to give effect to the "family" agreement; (2) finding, in effect, the statute of limitations had run against their claim; (3) failing to find that patentee of the land held a portion of the mineral interest as trustee of a resulting trust for their benefit; (4) failing to find the term "oil royalty" as used in the family agreement meant "minerals"; and (5) "excluding" evidence of relevant statements said to have been made by a deceased prior owner.

## II

■ The defendants' first contention is founded on the premise that the family agreement vested in each of the signatories a one-fifth interest in the mineral rights of the entire half section and that notice of such interest was imparted to the world once the agreement was filed in the probate case and approved by the court.

Several things seem to be wrong with the defendants' reasoning as we analyze the facts. To begin with, title to the 320 acres vested in the five children immediately upon their father's death, subject to the control of the county court and perfection through appropriate probate proceedings.[3] The five heirs, for some undisclosed reason, decided it was in their best interest to enter into an agreement regarding the distribution of the subject estate. Certain it is that the agreement itself did not operate to either vest title in or divest the title of any of the five signatories. It was no more and no

---

**2.** (emphasis added)

**3.** 84 O.S.1971, § 212.

less than what the parties called it—an agreement that the property should be judicially distributed in a certain way. Considering the language of the contract, the date it was made, and the fact that it was filed in the probate proceeding, one is compelled to conclude that it was not intended as a conveyance, but was made in contemplation of and subject to a distributive decree by the county court.

The second thing to bear in mind is that the contractual provision defendants contend vested a share of the mineral rights in them specifies that "each of the five heirs is to receive one-fifth interest of Oil Roalty [*sic*] on the West Half of Section 16, Twp. 20 N. Range 24 W.I.M. Ellis County, Oklahoma *should oil be produced on said land.*" [4] This seems to speak not to a present interest in all the mineral rights, but to a contingent interest in whatever "oil" may underly the land—an interest not to become vested unless and until oil is actually produced. There is, incidentally, no allegation or proof that any oil has yet been produced on the land, and the decree of distribution ignores the unusual provision altogether.

The third important fact is that none of the defendants attacks the final decree of distribution. It recites that all the heirs at that time received notice of the hearing held with regard to the administrator's petition for a final decree and, presumably, they all received copies of the decree.

These facts lead to the conclusion, it seems to us, that the people who owned the property expressed an agreement in writing as to how they wanted the court to distribute the estate assets, but, for reasons undisclosed, permitted and acquiesced in a decree of distribution that followed neither the terms of the contract nor the law of succession.[5] They do not now claim the decree is void,[6] but rather rely on the fact merely that it approved the agreement which forms the foundation for their requested recovery.

Under these circumstances we are of the opinion that the decree superceded the agreement and that the defendants are bound by the terms of the county court's decree of distribution.

## III

Defendants' next three propositions—(1) that the mineral interests were not abandoned by defendants; (2) that plaintiffs held four-fifths of the minerals in a resulting trust as a result of fraudulently inducing the land office to issue them a patent for all the minerals; and (3) that the term "oil royalty" as used in the family agreement should be found to mean "minerals"— need not be decided in view of the conclusion we have reached in connection with the first contention.

We might say, however, with regard to the third point, that for purposes of this review we can assume the term "oil royalty" means minerals. It does not make any difference. The decree of distribution did not distribute the minerals apart from the surface. W. E. Davis and Kate Skulley each received half of the land including half of the minerals, and each subsequently conveyed his or her interest to Kenneth Davis.

## IV

■ The last proposition—the exclusion of certain evidence—is one that could have been included with the previous three, but because it has a bearing on the contract-decree controversy and also on the issue of whether or not Kate Skulley conveyed whatever mineral interests she had to Kenneth Davis in 1937, we have opted to treat it separately.

The argument is that the court should have permitted Kate Skulley to testify regarding a conversation she had when she sold her land to Kenneth. The complaint is puzzling, however, because the fact is she

---

4. (emphasis added)

5. 84 O.S.1971, § 213.

6. *See Cassina v. Jones*, Okl., 340 P.2d 482 (1959), holding that county court decree distributing property contrary to the law of succession is void and subject to collateral attack at anytime.

did testify to the very thing she claims was excluded. She said that when the transaction was consummated, her brother W. E. Davis was present. Kate Skulley said she told her attorney, Jack Allen, that she wanted to hold her mineral rights. She does not say what her attorney told her, but she quotes her brother as saying: "You've already got them. There ain't no use to put it in."

We hold the testimony has so little probative value as to render it immaterial. Skulley had her lawyer there. Presumably she hired him to advise her concerning her legal rights and how to protect them. She does not suggest she was relying on her brother for the same thing, which, if she did so rely, would have to be considered incredible since it was his son buying the land. Even if she was impressed by her brother's alleged remark, it is inconceivable that she would not have referred the matter to her lawyer anyway and requested him to spell it out in the contract just to make sure her brother was right. After all, the contract does recite that it was "made in order that there might be no misunderstanding about the situation."

V

The decree appealed is not clearly against the weight of the evidence or contrary to law with regard to the issues raised by the parties.

BOYDSTON, J., concurs.

BACON, P. J., concurs in part and dissents in part.